## NEAL v DEPARTMENT OF CORRECTIONS

Docket No. 198616. Submitted September 4, 1997, at Grand Rapids. Decided June 5, 1998, at 9:15 A.M.

Tracy Neal, Helen Gibbs, and other female prisoners housed in facilities operated by the Michigan Department of Corrections (MDOC) brought a class action in the Washtenaw Circuit Court against the MDOC, its director, and several wardens, deputy wardens, and corrections officers, alleging that male corrections personnel have systematically engaged in gender-based discriminatory conduct, sexual harassment, and retaliation for reporting gender-based misconduct in violation of the Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*, and seeking injunctive and declaratory relief and monetary and compensatory damages. The court, Timothy P. Connors, J., entered orders dismissing the request for monetary damages and denying the defendants' motion for summary disposition that was based on several grounds. The court held, in part, that the MDOC is a "public service" agency prohibited from engaging in gender-based discrimination or harassment under subsection 302(a) of the act, MCL 37.2302(a); MSA 3.548(302)(a), and that the act does not exclude prisoners from its coverage. Most of the defendants were granted leave to appeal from the order denying their motion, but leave was limited to their claims concerning application of the Civil Rights Act and the court's subject-matter jurisdiction.

The Court of Appeals *held*:

1. To the extent a prison opens its doors to visitors, employees, officials, or other persons who voluntarily seek admittance or to utilize any service available to free citizens, those persons may not be subjected to any form of discrimination proscribed by the Civil Rights Act.

2. The Civil Rights Act does not apply to prisons' dealings with prisoners. The dictates of the act are not intended to be extended to prisoners.

3. Prisons are not a "place of public accommodation" or a "public service" and do not provide a "service to the public" as those terms are used in subsections 301(a) and (b) of the act, MCL 37.2301(a) and (b); MSA 3.548(301)(a) and (b). The part of the court's order

finding the Civil Rights Act to apply in this action must be reversed.

4. The plaintiffs are not without avenues of relief to redress their complaints. They may maintain actions against the defendants under 42 USC 1983 for alleged invasions of the plaintiffs' US Const, Am VI privacy rights and under the Equal Protection Clauses of US Const, Am XIV and Const 1963, art 1, § 2 if the defendants' gender-based classifications fail to serve important governmental objectives or are not substantially related to the achievement of those objectives.

5. The circuit court, rather than the Court of Claims, has proper jurisdiction to consider the remaining equitable and declaratory claims against the MDOC and its director because the court dismissed the original request for monetary damages and the plaintiffs are no longer seeking money damages. The part of the court's order finding that it had proper jurisdiction must be affirmed.

6. The matter must be remanded for further proceedings.

Affirmed in part, reversed in part, and remanded.

MACKENZIE, J., concurring in part and dissenting in part, stated that the case should be remanded for further proceedings and that the trial court did not err in finding that the plaintiffs have stated a valid cause of action under the Civil Rights Act. The order of the trial court should be affirmed. The trial court correctly ruled that the MDOC falls within the broad definition of a "public service" set forth in subsection 301(b) of the act. Because the protections of subsection 302(a) of the act were intended to be coextensive with the Equal Protection and Antidiscrimination Clauses in Const 1963, art 1, § 2, and because prisoners do not lose their right to equal protection by virtue of their status as inmates, it follows that the Legislature intended all persons, including inmates, to be protected under subsection 302(a). The Civil Rights Act does not preclude its application because of a person's status as an inmate. Merely because the MDOC engages in a practice that treats men and women differently does not automatically or necessarily mean that it has engaged in unlawful gender discrimination under subsection 302(a). The gender-based treatment may pass constitutional muster if it serves important penological interests and is substantially related to the achievement of those interests.

1. CIVIL RIGHTS — PRISONS AND PRISONERS — CIVIL RIGHTS ACT.

The Civil Rights Act does not apply to prisons with respect to their dealings with prisoners (MCL 37.2101 *et seq.*; MSA 3.548[101] *et seq.*).

2. CIVIL RIGHTS — PRISONS AND PRISONERS — CIVIL RIGHTS ACT — WORDS AND
     PHRASES — PLACE OF PUBLIC ACCOMMODATION — PUBLIC SERVICE.

    A prison is not a "place of public accommodation" or a "public ser-
    vice" "established to provide service to the public" as those terms
    are defined by the Civil Rights Act (MCL 37.2301; MSA 3.548[301]).

3. COURTS — JURISDICTION — COURT OF CLAIMS — CIRCUIT COURTS.

    Although the Court of Claims generally has exclusive jurisdiction over
    all claims and demands, liquidated and unliquidated, ex contractu
    and ex delicto, against the state or any of its agencies, a complaint
    against the state seeking only equitable or declaratory relief must
    be filed in the circuit court (MCL 600.6419[1][a]; MSA
    27A.6419[1][a]).

*Law Offices of Deborah LaBelle* (by *Deborah
LaBelle*), *Goodman, Eden, Millender & Bedrosian* (by
*Richard A. Soble* and *Mary R. Minnet*), *Molly Reno*,
and *Gail A. Grieger*, for the plaintiffs.

*Frank J. Kelley*, Attorney General, *Thomas L.
Casey*, Solicitor General, and *Lisa C. Ward*, Assistant
Attorney General, for the defendants.

Before: O'CONNELL, P.J., and MACKENZIE and GAGE,
JJ.

O'CONNELL, P.J. This is a class-action suit brought, in
relevant part, under the Civil Rights Act, MCL 37.2101
*et seq.*; MSA 3.548(101) *et seq.*, by female prisoners
housed in facilities operated by the Michigan Depart-
ment of Corrections (MDOC). Defendants are the
department, its director, and several MDOC wardens,
deputy wardens, and corrections officers. Defendants
appeal by leave granted from a circuit court order
denying their motion for summary disposition pursu-
ant to MCR 2.116(C)(4), (7), and (8). We affirm in
part, reverse in part, and remand.

The case arises out of allegations that male correc-
tions personnel have systematically engaged in a pat-

tern of sexual harassment of female inmates incarcerated by the MDOC. Specifically, plaintiffs' complaint alleges that the MDOC assigns male officers to the housing units at all women's facilities without providing any training related to cross-gender supervision; that women are forced to dress, undress, and perform basic hygiene and body functions in the open with male officers observing; that defendants allow male officers to observe during gynecological and other intimate medical care; that defendants require male officers to perform body searches of women prisoners that include pat-downs of their breasts and genital areas; that women prisoners are routinely subjected to offensive sex-based sexual harassment, offensive touching, and requests for sexual acts by male officers; and that there is a pattern of male officers' requesting sexual acts from women prisoners as a condition of retaining good-time credits, work details, and educational and rehabilitative program opportunities. The complaint also alleges that the inmates are subject to retaliation for reporting this gender-based misconduct. Plaintiffs claim that these actions, and defendants' failure to protect female inmates from this misconduct through adequate training, supervision, investigation, or discipline of MDOC employees, constitute gender-based discriminatory conduct, sexual harassment, and retaliation in violation of the Civil Rights Act. Plaintiffs' complaint requests injunctive and declaratory relief as well as compensatory damages.[1]

On August 1, 1996, defendants moved for summary disposition on the grounds that the circuit court

---

[1] An initial request for monetary damages was ordered dismissed.

lacked subject-matter jurisdiction, that the claims of
some class members were barred by release, prior
judgment, or statute of limitations, that all defendants
enjoyed immunity under Michigan law, and that plain-
tiffs had failed to state a claim upon which relief
could be granted. On September 24, 1996, the circuit
court denied defendants' motion on all grounds. On
October 23, 1996, defendants requested leave to
appeal the court's denial of their motion for summary
disposition with regard to the claims set forth under
the Civil Rights Act and with regard to the subject-
matter jurisdiction issue. This Court granted leave to
appeal on October 31, 1996, limited to those issues.
We now examine each issue in turn.

I

Defendants first claim that the Civil Rights Act
does not apply to prisoners incarcerated by the Michi-
gan Department of Corrections. Defendants specifi-
cally note that the language of the statute is inapplica-
ble because correctional facilities are not open to the
general public and because prisoners are not mem-
bers of the general public for purposes of the statute.
The trial court held that the MDOC is a "public service"
agency prohibited from engaging in gender-based dis-
crimination or harassment under subsection 302(a) of
the act, MCL 37.2302(a); MSA 3.548(302)(a). The
court further noted that the act does not specifically
exclude prisoners from its coverage and declined to
read such an exclusion into the act. Because this is
an issue of first impression in Michigan, our task is to
determine whether the Legislature intended the activi-
ties complained of here to be included within the
scope of the Civil Rights Act.

When interpreting a statute, our goal is to ascertain and effectuate the intent of the Legislature. *Folands Jewelry Brokers, Inc v City of Warren*, 210 Mich App 304, 307; 532 NW2d 920 (1995). The first criterion in determining intent is to examine the specific language in the statute. *Ballman v Borges*, 226 Mich App 166, 168; 572 NW2d 47 (1997). Statutory language should be construed reasonably, keeping in mind the purpose of the statute. *Attorney General v Public Service Comm*, 220 Mich App 561, 565; 560 NW2d 348 (1996). We resort to judicial construction only where the statute is so unclear that reasonable minds could disagree with regard to the meaning of the statute. *Folands, supra.*

The Legislature enacted the Civil Rights Act as a means of preventing discrimination directed against a person because of that person's membership in a certain class and to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases. *Noecker v Dep't of Corrections*, 203 Mich App 43, 46; 512 NW2d 44 (1993). The Preamble to 1976 PA 453 provides, in relevant part, that the purposes of the act include: "to define civil rights; to prohibit discriminatory practices, policies, and customs in the exercise of those rights based upon religion, race, color, national origin, age, sex, height, weight, familial status or marital status; . . . [and] to provide remedies and penalties . . . ." The act is remedial and must be liberally construed to provide a broad remedy. *Reed v Michigan Metro Girl Scout Council*, 201 Mich App 10, 15; 506 NW2d 231 (1993).

Article 3 of the Civil Rights Act prohibits discrimination in public accommodations and public services. Subsection 302(a) states:

Except where permitted by law, a person shall not:

(a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status. [MCL 37.2302(a); MSA 3.548(302)(a)].

Section 103 of the act, MCL 37.2103; MSA 3.548(103), declares that sexual harassment is a form of sex discrimination.

Section 301 defines "place of public accommodation" and "public service" as those terms are used in subsection 302(a). It states:

As used in this article:

(a) "Place of public accommodation" means a business, or an educational, refreshment, entertainment, recreation, health, or transportation facility, or institution of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public. . . .

* &ast; *

(b) "Public service" means a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof, or a tax exempt private agency established to provide service to the public. [MCL 37.2301; MSA 3.548(301)].

Finally, § 303 of the act creates an exemption under article 3 for private clubs:

This article shall not apply to a private club, or other establishment not in fact open to the public, except to the extent that the goods, services, facilities, privileges, advantages, or accommodations of the private club or establishment are made available to the customers or patrons of another establishment that is a place of public accommoda-

tion or is licensed by the state . . . . [MCL 37.2303; MSA 3.548(303)].

Plaintiffs argue that MDOC correctional facilities are places of "public service" under § 301 and subsection 302(a), and thus that discrimination against inmates, based on sex, is prohibited in such facilities. Defendants assert that if the MDOC is a "public service," its prisons are not required to comply with subsection 302(a) because they fall within the § 303 exemption for "private club[s], or other establishment[s] not in fact open to the public . . . ."

To the extent a prison opens its doors to visitors, employees, officials, or other persons who voluntarily seek admittance or to utilize any service available to free citizens, those persons concededly may not be the subject of any form of discrimination proscribed by the Civil Rights Act. However, we can perceive no legislative intent to extend the dictates of the Civil Rights Act to prisoners. A cardinal rule of statutory construction precludes any interpretation of a statute that leads to absurd or unjust results. *Williams v Secretary of State*, 338 Mich 202, 208; 60 NW2d 910 (1953). If the Civil Rights Act applies to prisoners, then the existence of separate prison *"facilities"* for men and women patently violates the statutory prohibition against gender discrimination; yet surely it is absurd to suggest that male and female prisoners must be housed together. See *Klinger v Dep't of Corrections*, 31 F3d 727 (CA 8, 1994); *Timm v Gunter*, 917 F2d 1093, 1102-1103 (CA 8, 1990). Similarly, it is absurd to suggest that the MDOC could not segregate prisoners according to age, despite legitimate penological purposes that are served by such a classification. Yet, if the Civil Rights Act applies to prisoners,

one might draw such a conclusion. Hence, we reject a reading of the act that would include prisons within its ambit in their dealings with prisoners.

Prison administrators must be accorded wide-ranging deference with respect to their adoption, implementation, and execution of policies and practices that in their judgment are needed to preserve internal order, discipline, and institutional security. *Bell v Wolfish*, 441 US 520, 547; 99 S Ct 1861; 60 L Ed 2d 447 (1979). However, that deference does not insulate from review actions taken in bad faith and for no legitimate penological purpose. *Whitley v Albers*, 475 US 312, 321-322; 106 S Ct 1078; 89 L Ed 2d 251 (1986). Thus, for example, a prison inmate generally lacks a reasonable expectation of privacy with respect to the Fourth Amendment protection against unreasonable searches and seizures. *Hudson v Palmer*, 468 US 517, 525-526; 104 S Ct 3194; 82 L Ed 2d 393 (1984). On the other hand, notwithstanding a prisoner's diminished right of privacy as compared with free citizens, the infringement of that privacy by prison officials cannot be based upon an arbitrary or irrational justification or no justification at all. *Bell, supra,* at 559.

Accepting, in the summary disposition context, the well-pleaded allegations of plaintiffs' complaint as true, *Horn v Dep't of Corrections*, 216 Mich App 58, 66; 548 NW2d 660 (1996), infringements of the privacy of female inmates occur on a regular basis in the Michigan correctional system. When faced with the conflict between legitimate security precautions and sexual harassment or abuse, a number of federal courts have required prison administrators to allow female inmates to dress or undress and use toilet facilities without unnecessarily being viewed by

guards or other prisoners, particularly those of the opposite gender. See, e.g., *Forts v Ward*, 621 F2d 1210, 1216-1217 (CA 2, 1980); *Lee v Downs*, 641 F2d 1117, 1119 (CA 4, 1981). Absent a showing of a legitimate governmental interest in the privacy invasions alleged, these unnecessary infringements on privacy rights are actionable under 42 USC 1983 as violations of plaintiffs' constitutional rights. *Dawson v Kendrick*, 527 F Supp 1252, 1316-1317 (SD W Va, 1981). Admittedly, 42 USC 1983 ordinarily does not permit vicarious liability to be imposed on prison administrators. See *Will v Michigan Dep't of State Police*, 491 US 58, 68-69; 109 S Ct 2304; 105 L Ed 2d 45 (1989). However, because the activity violates the Eighth Amendment, a *Bivens*[2]-type action, arising directly under the United States Constitution, may be maintained against both the recreant officials and the MDOC. *Carlson v Green*, 446 US 14, 19-20; 100 S Ct 1468; 64 L Ed 2d 15 (1980). See, also, *Smith v Dep't of Public Health*, 428 Mich 540, 618-619; 410 NW2d 749 (1987) (BRICKLEY, J.), aff'd sub nom *Will*, *supra*.

Plaintiffs may also have a direct constitutional claim. For example, the Equal Protection Clauses of the Fourteenth Amendment and Const 1963, art 1, § 2 may provide the constitutional underpinnings for a cause of action to redress the situation. *Craig v Boren*, 429 US 190, 197; 97 S Ct 451; 50 L Ed 2d 397 (1976); *Kersh v Bounds*, 501 F2d 585, 588 (CA 4, 1974). This type of action is appropriate if gender-based classifications fail to serve important governmental objectives or are not substantially related to

---

[2] *Bivens v Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 US 388; 91 S Ct 1999; 29 L Ed 2d 619 (1971).

the achievement of those objectives. See *Craig, supra.* A constitutional claim may also be appropriate against those persons or entities not amenable to suit under 42 USC 1983.

Our decision recognizes the rights of plaintiffs not to be subjected to any form of sexual harassment. At the same time, our decision accords proper deference to principles of statutory interpretation. By relying directly on the state and federal constitutions, we achieve the goal of legally protecting basic human rights. Thus, even though we hold that the Civil Rights Act does not apply to the MDOC's relations with prisoners, our decision is not a license for the MDOC to engage in discriminatory practices in the operation of its correctional facilities. The MDOC may still, consistent with the Fourteenth Amendment of the United States Constitution, treat prisoners differently on the basis of gender. However, the gender-based treatment must still pass constitutional muster—that is, the gender-based treatment must serve important penological interests and be substantially related to the achievement of those interests. See *Dep't of Civil Rights ex rel Forton v Waterford Twp Dep't of Parks & Recreation,* 425 Mich 173, 190-194; 387 NW2d 821 (1986); *Craig, supra.*

Finally, we feel it appropriate to reply to the concurring opinion. The parties recognize that the scope of the Civil Rights Act is limited to either a "place of public accommodation" or a "public service" as defined by the statute. The parties concede that a prison is not a "place of public accommodation." Therefore, in order for the MDOC to fall within the ambit of the Civil Rights Act, it must fall within the scope of the term "public service." While the statute

could, in fact, be read in a manner that supports plaintiffs' position, we believe that such a reading is inappropriate and dangerous.

The concurring opinion liberally construes the term "public service" and concludes that the MDOC "falls within the broad statutory definition of a 'public service' set forth in subsection 301(b)." *Post* at 217. While we may agree with the concurring opinion that subsection 301(b) is inartfully drafted, and that the Legislature may wish to redraft this definition, we do not conclude that the term somehow includes prisoners, or that prisons are "established to provide service to the public." We are not inclined to put a judicial gloss on the otherwise plain meaning found in this statutory definition.

It is important to remember that subsection 301(b) does not stipulate which buildings or agencies are included within the scope of the act, nor does it define the individuals that are or are not covered by the act. It defines the term "public service." The key phrase in this subsection is: "established to provide service to the public." The concurring opinion concludes that because the MDOC is a state "department" or "agency," then the Civil Rights Act must apply to any facilities that it operates; this interpretation is an oversimplification of the definition. No reasonable reading of the statute would conclude that "public service" merely means a department or agency. If the concurring opinion is correct, there would be no need to use or define the term "public service," because "government" would subsume the entire spectrum. See *Frank v William A Kibbe & Associates, Inc*, 208 Mich App 346, 350-351; 527 NW2d 82 (1995) ("In construing a statute, the court should presume that every

word has meaning and avoid a construction which would render a statute, or any part of it, surplusage or nugatory.").

The definition of "public service" in subsection 301(b) reads, in pertinent part: " 'Public service' means a . . . department [or] agency . . . owned, operated, or managed by or on behalf of the state . . . established to provide service to the public." Prisons are not established to provide service to the public (at least not to a public that includes prisoners). Indeed, they are designed to do just the opposite—to keep incarcerated individuals from the public. A prison is not like a court, a hospital, or the office of the Secretary of State, all of which were established to provide, and do provide, "service to the public."

It could be argued that prisons serve the public by confining individuals who commit felonies. However, this, in our opinion, is not the equivalent of "established to provide service to the public." If the concurring opinion is correct, then every act done by prison officials could subject those officials and the MDOC to a discrimination lawsuit. An example, hopefully, will clarify this point. Suppose that two gangs, membership in each of which is based on race or ethnicity, get into a fight in a Michigan prison. In order to avoid any further incidents, the warden arranges transfers of the gang leaders to different prisons. One of these individuals then brings a lawsuit pursuant to the Civil Rights Act against the MDOC, alleging that he was transferred on account of race, sex, age, or some other protected personal characteristic. Unfortunately, the concurring opinion would allow this type of discrimination lawsuit. We do not believe that this was the intended result of the Civil Rights Act. Pris-

oners simply are not protected against discrimination by the act (which is by no means to say that they are entirely unprotected; whatever restraints exist, however, are found outside the four corners of the act).

We conclude that in order for an agency or department to fall within the scope of the Civil Rights Act, it must be "established to provide service to the public." While prisons may perform a public service by confining those who have been convicted of serious crimes, they are not established as a "place of public accommodation" or as an agency that provides "service to the public." Given our conclusion, we reject any interpretation of the Civil Rights Act that would bring prisons within its scope and subject prison personnel to discrimination lawsuits brought by prisoners pursuant to the act.

II

Defendants' next argument on appeal is that the Court of Claims, not the circuit court, had subject-matter jurisdiction over plaintiffs' case. We disagree. While it is generally true that the Court of Claims has exclusive jurisdiction over "all claims and demands, liquidated and unliquidated, ex contractu and ex delicto, against the state" or any of its agencies, MCL 600.6419(1)(a); MSA 27A.6419(1)(a), a complaint against the state seeking only equitable or declaratory relief must be filed in the circuit court. *Silverman v Univ of Michigan Bd of Regents*, 445 Mich 209, 217; 516 NW2d 54 (1994). Because plaintiffs no longer are seeking money damages, the circuit court, rather than the Court of Claims, has proper jurisdiction to consider the remaining equitable and declaratory claims

against the MDOC and defendant Kenneth McGinnis in his official capacity as the director of the MDOC.

Affirmed in part, reversed in part, and remanded for further proceedings. We do not retain jurisdiction.

Gage, J., concurred.

MacKenzie, J. (*concurring in part and dissenting in part*). I agree with the result reached by the majority, that is, that this case must be remanded for further proceedings. I write separately because, in my view, the trial court correctly concluded that plaintiffs, female prisoners housed in facilities operated by the Michigan Department of Corrections (MDOC), have stated a valid cause of action under the Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.*

At issue in this case is the construction of subsection 302(a) of the act, which states:

> Except where permitted by law, a person shall not:
>
> (a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status. [MCL 37.2302(a); MSA 3.548(302)(a)].

"Public service" is defined as "a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof, or a tax exempt private agency established to provide service to the public." MCL 37.2301(b); MSA 3.548(301)(b). The MDOC is a state department or agency, and this state's correctional facilities are managed and operated by it. Liberally construing the statutory definition, as this Court is required to do, see *Reed v Michigan Metro*

*Girl Scout Council*, 201 Mich App 10, 15; 506 NW2d 231 (1993), the trial court correctly ruled that the MDOC falls within the broad statutory definition of a "public service" set forth in subsection 301(b). Defendants essentially concede as much.

According to the majority, the Legislature could not have intended subsection 302(a) to apply to prisoners housed in the MDOC's facilities because allowing inmates to bring discrimination claims against the state would lead to an absurd or unjust result. A review of the legislative history of the statute, along with the application of basic principles of statutory construction, leads me to a contrary conclusion.

The purpose of the Civil Rights Act is to prevent discrimination directed against a person because of that person's membership in a certain class and to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases. *Noecker v Dep't of Corrections*, 203 Mich App 43, 46; 512 NW2d 44 (1993). The act is remedial and must be liberally construed to effectuate its ends. *Reed, supra.*

An examination of the legislative purpose of the Civil Rights Act in general and subsection 302(a) in particular actually begins with the Michigan Constitution's Equal Protection and Antidiscrimination Clauses. Const 1963, art 1, § 2 states:

> No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation.

The Civil Rights Act was enacted as 1976 PA 453. Its purpose was two-fold. First, it was intended to centralize and make uniform the patchwork of then-existing civil rights statutes applying to the private sector, such as the Fair Housing Act, the Fair Employment Practices Act, and the Public Accommodations Act. See *Dep't of Civil Rights ex rel Forton v Waterford Twp Dep't of Parks & Recreation*, 425 Mich 173, 187-188; 387 NW2d 821 (1986). Second, it was intended to broaden the scope of the then-existing civil rights statutes to include governmental action:

> [T]he Legislature's addition of "public service" to [subsection] 302(a), thereby including state action violations that amount to constitutional deprivation with private sector, non-state action legislative violations, can be explained by the fact that article 1, § 2 of the Michigan Constitution provides: "the legislature *shall* implement this section by appropriate legislation." It is the only provision of the Declaration of Rights to so provide. [*Id.*, p 188 (emphasis in the original).]

Thus, insofar as subsection 302(a) of the Civil Rights Act governs "public service," it is essentially a codification of the constitution's Equal Protection and Antidiscrimination Clauses, broadened to include categories not covered under the constitution, such as age, sex, and marital status. See *Dep't of Civil Rights*, pp 188-189.

The constitutional equal protection guarantee applies to prisoners. As explained in *Jackson v Bishop*, 404 F2d 571, 576 (CA 8, 1968):

> Lawful incarceration may properly operate to deprive the convict of certain rights which would otherwise be his to enjoy. A classic example is [the] denial to the felon of the right to vote. . . .

\*        \*        \*

> On the other hand, a prisoner of the state does not lose
> all his civil rights during and because of his incarceration.
> In particular, he continues to be protected by the due pro-
> cess and equal protection clauses which follow him through
> the prison doors. [Citations omitted.]

Because, as our Supreme Court has stated, the pro-
tections of subsection 302(a) of the Civil Rights Act
were intended to be coextensive with the Equal Pro-
tection and Antidiscrimination Clauses of the Michi-
gan Constitution, and because prisoners do not lose
their right to equal protection by virtue of their status
as inmates, it follows that the Legislature also
intended all persons—including inmates—to be pro-
tected under subsection 302(a).

Further, as noted by the trial court, nowhere does
the language of the Civil Rights Act purport to pre-
clude its application because of a person's status as a
prisoner or inmate. Compare *Marsh v Dep't of Civil
Service*, 142 Mich App 557, 569; 370 NW2d 613 (1985);
*Walters v Dep't of Treasury*, 148 Mich App 809, 819;
385 NW2d 695 (1986). When the Legislature has seen
fit to exclude prisoners from the provisions of a stat-
ute, it has specifically done so. See, e.g., MCL
15.231(2); MSA 4.1801(1)(2), excluding "those persons
incarcerated in state or local correctional facilities"
from provisions of the Freedom of Information Act. A
court must not judicially legislate by adding into a
statute provisions that the Legislature did not include.
*Empire Iron Mining Partnership v Orhanen*, 455
Mich 410, 421; 565 NW2d 844 (1997). Yet the majority
has done precisely that by effectively adding to the
Civil Rights Act an exclusion barring prisoners from
bringing an action under subsection 302(a) of the act.

The majority believes that reading subsection 302(a) of the Civil Rights Act as applying to prisoners leads to an absurd result because, if the act applies to inmates, then the existence of separate prison facilities for men and women would violate its prohibition against gender discrimination. That is an oversimplification that fails to take into account our Supreme Court's observation that subsection 302(a) is a codification of the Equal Protection Clause of the Michigan Constitution. *Dep't of Civil Rights, supra.* As stated in *Dep't of Civil Rights,* p 189:

> Discrimination, in constitutional terms, refers to baseless and irrational line drawing. . . . When there is a sufficiently important governmental interest and the classification is adequately related to that interest, it does not amount to discrimination to draw legislative lines on the basis of those classifications.
>
> It would be anomalous at best and contradictory at worst to attempt to rid the state of discriminatory practices by the use of an arbitrary standard that would prohibit, in effect, any line drawn between the genders, regardless of its relevance to the purpose of the regulation, unless the Legislature, in its wisdom and its own good time, countervails it.

Thus, merely because the state has engaged in a practice that treats men and women differently does not automatically or necessarily mean that it has engaged in unlawful gender discrimination. Rather, the test is whether the gender-based treatment serves a sufficiently important governmental interest and is substantially related to the achievement of that interest. *Id.,* p 189. Clearly, maintaining separate prison facilities for male and female prisoners serves important penological interests and is substantially related to those interests. The state's operation of such facilities

therefore would not give rise to a valid discrimination claim under subsection 302(a) and would not lead to the absurd result the majority perceives. Rather, the MDOC could still treat prisoners differently on the basis of gender without violating subsection 302(a), provided that the gender-based treatment could pass constitutional muster—that is, if the gender-based treatment served important penological interests and was substantially related to the achievement of those interests. See *Dep't of Civil Rights, supra,* pp 190-194.

Finally, it should be noted that this approach to state sex discrimination claims by inmates mirrors not only the analysis employed in equal protection cases, but also the analyses typically employed by federal courts in 42 USC 1983 actions. See anno: *Sex discrimination in treatment of jail or prison inmates,* 12 ALR4th 1219. A holding that prisoners are not excluded from the protections of subsection 302(a) of the Civil Rights Act would therefore impose upon defendants no stricter standards than those to which they must presently adhere in order to survive either a constitutional or § 1983 challenge. In the absence of any meaningful evidence that the Legislature intended to deny plaintiffs a statutory remedy for defendants' alleged gender-based misconduct, I would affirm the order of the trial court.